LEDYARD P. HALE, as Receiver of the ST. LAWRENCE MANU-
FACTURING COMPANY, Appellant, *v.* MARCUS P. MASON,
Respondent.

CORPORATIONS — ACTION BY CORPORATION AGAINST ONE OF ITS
TRUSTEES FOR DAMAGES FOR PREVENTING CONSUMMATION OF ADVANTA-
GEOUS CONTRACT. In an action by a manufacturing corporation against
one of its trustees, for damages for preventing the consummation by out-
side parties of a contract made by them with the corporation to furnish
certain advantageous inducements for the removal of its works, a non-
suit is proper when it appears that the trustee, in advising such parties
that material facts in regard to the condition of the corporation had been
concealed from them, performed only an obvious duty as a matter of
honest business dealing, and that there was no act of the defendant which
could be regarded in law as the proximate cause of the abandonment of
the contract, but the abandonment resulted from the report of an expert
who examined the condition of the corporation at the suggestion of its
president, after the trustee's disclosure.

*Hale* v. *Mason*, 22 App. Div. 630, affirmed.

(Argued October 9, 1899; decided November 21, 1899.)

APPEAL from a judgment of the Appellate Division of the
Supreme Court in the third judicial department, entered Jan-
uary 12, 1898, affirming a judgment nonsuiting plaintiff at
the close of all the evidence.

The nature of the action and the facts, so far as material,
are stated in the opinion.

*E. H. Neary* for appellant. The plaintiff established a
cause of action against defendant, and it was error to grant
the nonsuit. (*Hun* v. *Cary*, 82 N. Y. 65; *Hoyle* v. *P. &
M. R. R. Co.*, 54 N. Y. 314; *C. C. & I. Co.* v. *Sher-
man*, 30 Barb. 553; *Duncombe* v. *N. Y., H. & N. R. R.
Co.*, 84 N. Y. 198; *Hubbard* v. *Investment Co.*, 14 Fed.
Rep. 675; *Wardell* v. *U. P. R. R. Co.*, 103 U. S. 509;
*Morrison* v. *O. & L. C. R. R. Co.*, 52 Barb. 173; *Bill*
v. *W. U. T. Co.*, 16 Fed. Rep. 14; *Adair* v. *Brimmer*, 74
N. Y. 539; *M. B. F., etc., Co.* v. *Boisseiux*, 3 Fed. Rep.
817.) It was error to refuse to submit the case to the jury.

(*Hart* v. *H. R. B. Co.*, 80 N. Y. 622; *Higgins* v. *Eagleton*, 155 N. Y. 466; *Stuber* v. *McEntee*, 142 N. Y. 200; *Sullivan* v. *N. Y. & R. C. Co.*, 119 N. Y. 348; *Cutter* v. *Morris*, 116 N. Y. 310; *Smith* v. *Coe*, 55 N. Y. 678; *Ernst* v. *H. R. R. R. Co.*, 35 N. Y. 9; *Sheridan* v. *B. C. & N. R. R. Co.*, 36 N. Y. 39; *Keller* v. *N. Y. C. R. R. Co.*, 24 How. Pr. 172; *Gonzales* v. *N. Y. & H. R. R. Co.*, 39 How. Pr. 407.) As to the statement made by Corbin and the negotiations leading up to the execution of the Minneapolis contract, it is well settled that all such are merged in the written agreement. (Greenl. on Ev. § 275; Starkie on Ev. 648–655.) There is no allegation in the answer of any false representations having been made to induce the execution of the Minneapolis contract. There was no such issue as defendant was allowed to interpose and to give evidence of under plaintiff's objection. Hence it was error to overrule the objection and to receive the evidence. (Code Civ. Pro. §. 500; *McKyring* v. *Bull*, 16 N. Y. 297; *Linton* v. *U. F. Co.*, 124 N. Y. 533.) The defendant cannot avoid responsibility on the grounds that there is no proof that the Minneapolis contract was ratified by the company's trustees or stockholders, or that said contract could not be legally ratified and is void from its inception. (*Paige* v. *Willet*, 38 N. Y. 28; *Brazill* v. *Isham*, 12 N. Y. 9; *Sage* v. *Culver*, 147 N. Y. 241; *W. A. Co.* v. *Barlow*, 63 N. Y. 62; *Leslie* v. *Lorillard*, 110 N. Y. 519; *B. G. L. Co.* v. *Claffy*, 151 N. Y. 24; *Koehler* v. *Reinheimer*, 26 App. Div. 1; *H. & G. M. Co.* v. *H. & W. M. Co.*, 127 N. Y. 252; *Holm* v. *C. L. B. Co.*, 21 App. Div. 204; *Fuld* v. *B. B. Co.*, 18 N. Y. Supp. 456.)

*A. E. Kilby* for respondent. There was no error in the ruling nonsuiting the plaintiff, as the facts show that defendant did not prevent the consummation of the Minneapolis contract. (*Linkhauf* v. *Lombard*, 137 N. Y. 426; *Hemmens* v. *Nelson*, 138 N. Y. 529; *Slee* v. *Bloom*, 19 Johns. 459; *Briggs* v. *Penniman*, 8 Cow. 387; *Bank of Poughkeepsie* v. *Ibbotson*, 24 Wend. 473; *Bank of Augusta* v. *Earl*, 13

Pet. 519; *La Fayette Ins. Co.* v. *French*, 18 How. [U. S.] 404; *Merrick* v. *Van Santvoord*, 34 N. Y. 208; *Stevens* v. *P. Ins. Co.*, 41 N. Y. 150; *Plimpton* v. *Bigelow*, 93 N. Y. 598.) But if the court had erred in granting the nonsuit, the error is not reviewable here, as no exception was taken. (*Smith* v. *Stephens*, 47 Hun, 318; *Halpin* v. *P. Ins. Co.*, 118 N. Y. 165; *Train* v. *H. P. Ins. Co.*, 62 N. Y. 598.)

BARTLETT, J. This action was begun by the St. Lawrence Manufacturing Company in the early part of 1891, to recover damages of the defendant, who was one of the trustees of the company, by reason of his alleged misconduct, which prevented the consummation of contracts that would have proved of great value to the company.

This corporation had its general office and factory at Gouverneur, St. Lawrence county, and its business consisted in manufacturing agricultural implements, principally disc harrows and wagons and their attachments.

The transactions covered by this litigation took place principally in the year eighteen hundred and ninety.

It is established by uncontradicted evidence that the annual report of the directors to the stockholders on the first of January, 1890, disclosed that the capital of the company was materially impaired and during the years 1888–'89 very serious losses had been made.

In a letter that Corbin, the president of the company, addressed to the defendant on the 10th of April, 1890, he said, among other things: " I do not hesitate to tell you that the outlook is not sufficiently promising here to warrant me in spending the most valuable years of my life in trying to work out a profit for my friends. The past eight weeks has been a revelation to us all. The bottom of the disc harrow trade seems to have dropped out entirely throughout the eastern states. The market has been flooded with cheap instruments and the agents from every establishment in the country swarm over our disc harrow district long before we could get at it, and we are going to experience great difficulty

in unloading even one-half of the machines that we have ready for the market."

Under these discouraging circumstances, it was discussed by the board of directors whether it would not be wise to transfer the business of the corporation to some western state, where manufacturing could be conducted under more favorable conditions and the market more readily reached.

The result was that a resolution was passed April 2d, 1890, appointing the president of the plaintiff company and Mr. Mason, the defendant, a committee to find the best terms that could be made for this removal.

Shortly before this, a contract had been drafted between the East Omaha Land Company and the plaintiff corporation, subject to the ratification of the stockholders of the latter, which provided in substance that the land company would donate to the manufacturing company five acres of land for the purpose of locating its business, trackage facilities connecting their factory with the Union Pacific railroad, and money to the extent of ten thousand dollars, for the purpose of moving its plant and erecting its buildings.

While the defendant is charged with having prevented the execution of this contract, the evidence shows that the stockholders of the plaintiff never ratified the contract, and that it was voluntarily abandoned by the company for the reason that a more advantageous agreement was secured later at Minneapolis, in the state of Minnesota.

On the 23rd of April, 1890, four individuals, as parties of the first part, made a contract with the plaintiff corporation, as party of the second part, which in substance provided that they would donate five acres of land for building purposes, trackage facilities from railroad to factory, and a cash bonus of thirty thousand dollars, paid in specified installments, five thousand dollars of which was paid down at the time of the execution of the contract. This five thousand dollars was paid to Corbin, the president of the company, who conducted the Minneapolis negotiations from beginning to end.

It seems that the defendant was the owner of lands in the

neighborhood of the real estate that was to be benefited by the contract with the East Omaha Land Company, and his associates in the ownership of adjacent land were of opinion that he should contribute his fair share to the bonus that was to be paid to the plaintiff company. To this the defendant made objection, and it seems to have been, to some extent, an obstacle to further negotiations. He offered to turn in, as a payment of his share of the bonus, certain lands that he owned in that locality, but his figures were deemed too high.

It also appears that he had originally made an agreement with Corbin, the president of the plaintiff company, by which he was to receive a bonus from his own company of $3,200.00 if the arrangement went through.

When the defendant was advised that the Minneapolis deal was closed he immediately wrote to Corbin, who had returned to the state of New York, that he would expect the same bonus in the Minneapolis matter that had been promised him in the Omaha contract.

Corbin replied that there was no basis for such a claim on the defendant's part, and this circumstance led to a bitter quarrel between Corbin and the defendant, which appears in the evidence, both in correspondence and personal interviews.

In substance it came to this : That the defendant Mason said that Corbin had imposed upon the Minneapolis parties by false statements as to the condition of the New York corporation, and that the deal could never go through if the Minnesota parties knew the exact truth in regard to the matter.

He further stated to Corbin that he felt it was his duty in the premises, as many of his friends in Minnesota were interested in the matter, to advise them that they had better send an expert east and look into the true condition of the plaintiff company. This he did, and an expert named Boshart was sent down to Gouveneur, but, as he seemed to be in the interest of Mason, and was not duly accredited in the estimation of the company's officers, he was refused access to the books and factory of the corporation. He returned to Minnesota and later Corbin visited Minneapolis and had an interview with

the parties who had executed the contract with him, in which he stated that his representations were not false or fraudulent, and he trusted the contract would be carried out; that the company was ready to perform on its part.

He also stated that he was willing to pay the expenses of an expert to come east and examine the general condition of the company. Matters were held in suspension at this point, and an expert named Allen was sent to Gouverneur and spent over a week in examining the machinery and books of account of the company. Allen was an expert in the carriage manufacturing business, as well as an accountant. On his return to Minneapolis, he made a report to the parties in interest there, which was exceedingly unfavorable and showed that Corbin's representations were not wholly trustworthy. For instance, he found figures that had been placed upon the book accounts were far too high, and that accounts that had been charged off to profit and loss were revived and put among the live assets; that the machinery account that stood at $12,000 should be reduced to $3,500, much of the machinery being old and valueless; instead of a thousand wagons having been sold by the plaintiff company, he thought the number should be reduced to two hundred or two hundred and fifty, and as to the patent account covering the disc harrows, he found that licenses had been disposed of for the central states to a concern in Illinois, and the same was true of very large interests on the Pacific coast; he also found that Corbin's representations as to the value of the particular kind of wagon manufactured by the company were exaggerated, and that a steel axle, which was claimed to be a valuable feature of it, was not a practical thing from a mechanical standpoint.

Without going further into detail, he summed up that to take this eastern company would mean, practically, that they had to run it and furnish the capital to keep it going, and get no benefit of the transaction, except to dispose of certain lands in the neighborhood of the factory. He afterwards added that the real estate that Corbin had valued at $8,000 in Gouverneur only cost the company about $4,000; he also stated

that he was not influenced in this report in any way by the action of the defendant.

The result of this report led to an abandonment of the Minnesota contract, the parties of the first part refusing to go on with the performance of it, on the ground that they had been deceived as to the real condition of the eastern company. A subsequent effort was made to get the parties together in a new contract, but it failed.

It was after these transactions that the company, before it passed into the hands of a receiver, who now represents this litigation on its behalf, decided to bring this action against the defendant for $53,000, damages, by reason of having prevented the execution of these contracts.

At the close of all the evidence the defendant's counsel moved for a nonsuit on six distinct grounds, only one of which need be noticed, as the learned trial judge placed his granting of the motion on that particular ground, to wit, that there is no proof that the defendant performed any act preventing the execution of the contract, Exhibit " B," with the Minneapolis parties.

The trial judge had previously suggested that the contract with the East Omaha Land Company had been voluntarily abandoned by the plaintiff company, and that the sole issue in this case was under the Minneapolis agreement.

It must be admitted that this record is not particularly creditable, either to the president of the company or to this defendant. The former is shown to have concealed the truth in regard to this well-nigh moribund corporation, and the defendant seems willing to have done the same thing if his bonus of $3,200 had been paid him under the Minnesota contract. Nevertheless it was due to the defendant's suggestion that the affairs of the plaintiff company were examined by the parties to the Minnesota contract.

As matter of honest business dealing the defendant performed only an obvious duty when he advised the Minnesota parties that material facts in regard to the condition of the plaintiff company had been concealed from them, and it seems

perfectly clear that the report of Allen, the second expert, resulted in the abandonment of this contract, and that no act of the defendant can be regarded in law as the proximate cause of this result.

There is a technical point raised by the defendant to which we see no answer. He urges that the record discloses no exception by the plaintiff on the granting of defendant's motion to nonsuit. This seems to be so, and plaintiff's explanation in his reply brief does not meet the point. It is, perhaps, not strictly necessary to rule upon this question, as we have examined the merits and are satisfied that the motion to nonsuit was properly granted.

The judgment should be affirmed, with costs.

All concur.

Judgment affirmed.